**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 12-cv-01898-RM

Jerry Vernon White

  Plaintiff,

v.

Carolyn W. Colvin, Acting Commissioner,
Social Security Administration,

  Defendant.

---

# ORDER

---

## I.  INTRODUCTION

Plaintiff Jerry Vernon White (plaintiff) first applied for disability insurance benefits (DIB) and

supplemental security income (SSI) on March 10, 2009, alleging disability due to chronic obstructive

pulmonary disease (COPD); emphysema; pain and swelling/edema in his knees, ankles, and hands;

fatigue; and depression for a period beginning January 10, 2007.  (ECF No.8-2, pp.1, 197, 204, 235).

His claims were denied on August 27, 2009, whereupon he filed a timely written request for a hearing

which was granted.  (ECF No.8-2, pp. 73, 85).  Hearings were held before an Administrative Law Judge

(ALJ) on February 17, 2011 and later on July 13, 2011.  (ECF No. 8-2, pp 33-73).

 Plaintiff appeared, testified and was represented at both of the hearings.  *Id.*  On July 25, 2011,

the ALJ denied his application and found plaintiff "not disabled".  (ECF No. 8-2, pp.15-27).  This denial

became the Commissioner of Social Security's (Commissioner) final decision when the Appeals Council

in a written opinion dated May 24, 2012, denied plaintiff's appeal.  (ECF No.8-2, pp. 1-7).  Plaintiff now

seeks review of that final decision.

Oral argument was held in this matter in August 2013, and the court requested supplemental

briefing with respect to matters raised by the court *sua sponte*.  The parties filed the briefing requested.[1]

(ECF Nos. 32 and 33).

## II      BACKGROUND

### A.      General:

Plaintiff was born on September 4, 1964.  (ECF No.8-2, pp.26, 74, 197).  At the date of his

alleged onset of disability, plaintiff was 42 years old.  *Id.*  Plaintiff completed 11th grade and later

attended a trade school where he was certified as a heavy collision technician after completing an auto

body repair course.  (ECF No.8-2, pp.26, 57, 240, 245).  His work history includes auto body repair,

flooring installation and driving a tow truck.  (ECF No.8-2, pp. 57, 240).

### B.  Medical:

Timothy Lewan, M.D., has been plaintiff's primary care physician since at least 2004.  (ECF

No.8-2, pp. 467-472.)  Prior to the plaintiff's alleged onset of disability in January 2007, plaintiff was

diagnosed with COPD and asthma, severe pulmonary hypertension, early onset emphysema secondary

to smoking with an asthmatic component, and sleep apnea.  (ECF No.8-2, pp. 358, 371-72, 380, 385-86,

389).  Plaintiff had a history of upper respiratory infections, methamphetamine use and smoking one to

two packs of cigarettes per day.  (ECF No.8-2, pp.367, 386, 467, 470, 479).  He was hospitalized in

February 2006, and again on August 26, 2006, for respiratory failure and pneumonia.  (ECF No.8-2, pp.

357-59; 367-69).

---

[1]  Upon review of the supplemental briefs, the court is persuaded that its decision cannot rest on matters not raised by plaintiff, but only by the court *sua sponte*.  (ECF NO.32).  Accordingly no further discussion is necessary with respect to the matters raised *sua sponte*.

Following plaintiff's alleged onset of disability in January of 2007, the record reveals in May 2007, Dr. Lewan saw and examined plaintiff for an upper respiratory infection and symptoms of fatigue, shortness of breath and wheezing.  (ECF No.8-2, pp. 485-487).  Subsequently, when Dr. Lewan saw plaintiff for right upper quadrant pain, plaintiff reported that his COPD symptoms had improved with the prescribed medications although he was not taking them regularly.  (ECF No.8-2, pp. 488-490).  Later notes reflect that plaintiff was doing well on an antidepressant(Wellbutrin), with no side effects or suicidal ideation, that his asthma was "ok" if he was on his medications and he was making progress with his attempts to decrease his tobacco use.  (ECF No.8-2, pp. 497-502).  Notes dated February 1, 2008, indicate that plaintiff had unchanged mild to moderate asthma, mild to moderate upper respiratory infection symptoms, reported that he was not taking his respiratory medications regularly, and that his depression was "doing ok" with continued use of Wellbutrin which also helped his attempts to cut down on his smoking.  (ECF No.8-2, p. 515).

On April 9, 2008, Barry Make, M.D., saw and examined plaintiff who presented with complaints of shortness of breath.  (ECF No.8-2, pp. 506-508).  Dr. Make noted (and spirometry confirmed), that plaintiff suffered from COPD (mild to severe), with a history of repeated exacerbations but that plaintiff continued to smoke.  (ECF No.8-2, p.507).  At that appointment plaintiff reported that he was short of breath when walking half a block on level ground and was therefore unable to work.  (ECF No.8-2, p.506).  He also reported that prescribed medications did help.  *Id.*  Dr. Make noted plaintiff had a normal gait and station, normal mood and affect and that plaintiff's answers to the intake questionnaire indicated he had mild depressive anxiety symptoms.  *Id.*  Dr. Make prescribed medications (Spiriva and Advair), for plaintiff's respiratory symptoms and recommended smoking cessation and lifestyle modifications, including weight reduction and regular exercise.  (ECF No.8-2, p. 508).

On April 2, 2009, plaintiff presented with complaints of swelling in his right knee for eight months despite elevating it, applying ice and heat and wrapping it.  (ECF No.8-2, p. 518).  He was seen and examined by David Munoz, M.D.  *Id.*  Plaintiff reported to Dr. Munoz, that he had quit smoking in 2008.  (ECF No.8-2, pp. 518-19).  Dr. Munoz prescribed Naprosyn, gave plaintiff a letter excusing him from jury duty and scheduled a return to clinic in two to three weeks for re-evaluation and possible aspiration/injection of plaintiff's knee.  *Id.*

Plaintiff next saw Dr. Make on July 29, 2009 complaining of difficulty walking because of right joint pain and dizziness.  (ECF No.8-2, pp. 670-674).  That same day (July 29, 2009), Scott VanDaWalker, a nurse practitioner (NP), completed a Med-9 Form for the Colorado Department of Human Services indicating that plaintiff had been or would be totally and permanently disabled due to a physical impairment.  (ECF No.8-2, p. 661).  In contrast, on August 7, 2009, M. Canham, M.D., a State agency medical consultant and non-examining expert, concluded that plaintiff was only partially credible, had no significant limitations due to a psychiatric impairment and was not disabled as a result of his medical conditions.  (ECF No.8-2, pp. 77-83).

On August 17, 2009, Richard F. Grenhart, Psy.D., a consultative examiner, diagnosed plaintiff with an Axis I diagnosis of adjustment disorder with depressed mood and an Axis III diagnosis of chronic pain, emphysema and COPD by history.  (ECF No.8-2, p.556).  Dr. Grenhart stated plaintiff clearly reported restricted daily and social activities, but that his limitations "appear[ed] to be primarily physical/medical with some concomitant depression secondary to limitations and chronic pain."  Dr. Grenhart assessed plaintiff with a GAF[2] of 65 (mild symptoms).  (ECF No.8-2, p. 557).  On August 27, 2009, MaryAnn Wharry, Psy.D., prepared a Psychiatric Review Technique (PRT) Analysis in which she

---

[2] "Global assessment of functioning" or GAF score is a 100-point scale used to assess an individual's overall functioning and his ability to carry out the daily activities of living.  A GAF of 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Keyes-Zachary v. Astrue,* 693 F.3d 1156, 1173,  n.1 (10th Cir. 2012).

concluded plaintiff had a medically determinable impairment (COPD), but that his impairment was not severe.  (ECF No.8-2, pp. 90-91).

On September 17, 2009, Elizabeth Regan, M.D., Ph.D., a rheumatologist and orthopedic surgeon, examined plaintiff who presented with complaints of bilateral knee pain, right worse than left, and bilateral ankle pain.  (ECF No.8-2, pp. 608-610).  Dr. Regan noted that plaintiff had smoked for about 34 years (more than two packs/day), had a history of exposure to paint fumes, had been a methamphetamine drug abuser, was currently on oxygen, quite short of breath and had recently completed a course of antibiotics and steroids from an acute exacerbation of his respiratory symptoms. (ECF No.8-2, p. 608).

Dr. Regan's differential diagnosis was possible mild osteoarthritis versus an occult meniscus tear; and she ordered an MRI scan of plaintiff's right knee to rule out a meniscus tear and a bone density test to rule out bone loss.  (ECF No.8-2, pp. 609-10).  The next day, on September 18, 2009, Dr. Joyce Schroeder determined from X-ray that plaintiff had no evidence of significant arthritis in either ankle and mild osteoarthritis in his hips and knees.  (ECF No.8-2, pp. 602-607).  On September 21, 2009, John Newell, M.D., interpreted plaintiff's X-rays as showing mild osteopenia, emphysema, and pulmonary arterial hypertension consistent with COPD.  (ECF No.8-2, p.599).

On October 2, 2009, Dr. Regan interpreted plaintiff's bone densitometry as osteopenic (opining this was likely a result of his chronic steroid use), and his MRI as indicating early mild osteoarthritis. (ECF No.8-2, pp. 593-94).  She noted that his gait was normal, that he declined examination and opined that his right knee pain was consistent with a non-displaced posterior tear of his medial meniscus and very mild osteoarthritis.  (ECF No.8-2, p. 653).  After discussing the option of surgery or conservative management, plaintiff elected conservative management (*e.g.,* physical therapy and weight loss).  *Id.*

On October 19, 2009, plaintiff consulted Jennifer Janssen, M.D., regarding his bone health. ((ECF No.8-2, pp. 657-659).  Plaintiff reported that he tried to exercise but could barely tolerate ambulating one-half block on flat ground.  (ECF No.8-2, p. 658).  Plaintiff also reported chronic intermittent fatigue, back pain, osteopenia, a longstanding history of depression, but denied suicidality. *Id.*  Dr. Janssen found plaintiff's gait was within normal limits and assessed plaintiff as having steroid induced osteopenia in his lumbar spine.  *Id.*

In December, 2009, Dr. Regan saw plaintiff for follow-up regarding his right knee pain and opined his gait appeared to be within normal limits and his right knee pain was improving..  (ECF No.8-2, pp. 653-654).  Several months later on February 24, 2010, NP VanDaWalker completed a second Med-9 Form, certifying that plaintiff had been or would be disabled for six or more months due to a disabling physical or mental impairment.  (ECF No.8-2, pp.663-664)  NP VanDaWalker opined that plaintiff had profound dyspnea, impairment of mobility, and a new onset of anxiety and depression. (ECF No.8-2, p. 664).

Several days after NP VanDaWalker's report, on March 1, 2010, Amy Lukowski, Psy.D., saw plaintiff in consultation for a health and behavior evaluation to determine the psychosocial factors impacting his emphysema.  (ECF No.8-2, pp. 645-647).  Plaintiff reported depression and frustration; high fatigue and high pain in his right knee; that he had recently started taking medical marijuana, had stopped smoking a year and a half ago and used oxygen at night.  (ECF No.8-2, p. 645).  Plaintiff also reported difficulty with a divorce and having suicidal ideation the past summer but, did not have any current suicidal ideation or plan.  *Id.*  Dr. Lukowski opined that plaintiff was experiencing depression and anxiety, with anxiety in the moderate range and depression in the mild range.  (ECF No.8-2, p.646). Dr. Lukowski planned psychiatric evaluation and behavioral health treatment however there is no evidence in the record indicating that plaintiff ever returned for treatment with Dr. Lukowski.  *Id.*

Approximately a week later, on or about March 9, 2010, plaintiff had a psychiatric consultation with Allison Heru, M.D.  (ECF No.8-2, pp. 642-643).  In this instance, plaintiff reported: worsening depressive and anxiety symptoms, resulting in shortness of breath and lightheadedness at least daily; crying daily for six months; fleeting suicidal ideation for the past year and a half; knee injuries; inability to do basic household chores; inability to walk because he lives in a hilly area; using two liters of oxygen at night; quitting smoking a year ago; and that Wellbutrin caused him a lot of agitation.  (ECF No.8-2, p. 642).  Dr. Heru noted that plaintiff was tearful through most of the interview and presented with symptoms of major depression worsening over the past year.  (ECF No.8-2, p. 643).  Plaintiff agreed to start a titrating dose of an antidepressant (Veniafaxine), and return for follow-up in two weeks. *Id.*  There is no evidence in the record that plaintiff ever saw Dr. Heru again or was treated by her.

On April 9, 2010, plaintiff sought medical attention from Dr. Regan after slipping while shoveling snow.  (ECF No.8-2, pp. 638-39).  Dr. Regan diagnosed an acute exacerbation of plaintiff's right knee osteoarthritis and medial meniscus tear.  *Id.*  Plaintiff elected to try conservative treatment of a local steroid injection.  (ECF No.8-2, p.639).  Dr. Regan reminded plaintiff that he needed to get back on a physical therapy program; opined that plaintiff had not been "terribly compliant"; and noted plaintiff had not yet obtained a stationary bicycle.  *Id.*

On July 9, 2010, Dr. Regan saw plaintiff for follow-up of his right knee osteoarthritis and meniscal tear.  (ECF No.8-2, pp.635-636).  Plaintiff reported he had attained some weight loss, was riding a stationary bike, and had not had any significant problems with his knees.  *Id.*  Dr. Regan opined his knee looked good, that he moved on and off the examining table well and was walking well.  *Id.*  Dr. Regan recommended continued physical therapy, focusing on stationary bike and pool walking.  *Id.*

On October 27, 2010, Michael T. Finch, M.D., a consultative examiner, saw and evaluated plaintiff.  (ECF No.8-2, pp. 578-579, 684-688).  Dr. Finch noted that plaintiff's gait was antalgic

(avoiding pain), that he was using a cane in his right hand, and had nasal oxygen with him but was not

using it.  (ECF No.8-2, p.684).  Plaintiff reported a pain level in his knees, hips, lower back, heels,

bilateral wrists and hands for which he used Velcro braces.  *Id.*  Plaintiff also reported that he could sit

for an hour, stand for 20 minutes, walk half a block without oxygen, and lift and carry 20 pounds.  *Id.*

Plaintiff reported that he lived with a roommate, was involved in grocery shopping, meal preparation,

and self-care activities.  (ECF No.8-2, p.684).  He denied alcohol or recreational drug use.  *Id.*  On

examination, Dr. Finch noted plaintiff had: bilateral positive Tinel (a test used to diagnose carpal tunnel

syndrome), results and pain in his wrists and fingers, normal range of motion in his neck, shoulders,

elbows, forearms and ankles; and decreased right knee strength secondary to pain; and no significant

knee pain and concluded that although plaintiff had COPD and emphysema, chronic depression,

agitation for which he was seeing a therapist, he could perform light work.  (ECF No.8-2, pp.689-94).

Two days later on October 29, 2010, Dr. Regan saw plaintiff for follow-up on his right knee.

(ECF No.8-2, pp.632-633).  Plaintiff reported that he had not complied with his knee exercise program

and believed his knee was getting worse but refused a steroid injection.  (ECF No.8-2, p.632).  Dr.

Regan diagnosed plaintiff with right medial knee pain secondary to medial meniscus tear; obesity; and

COPD.  *Id.*  Dr. Regan noted that she had a long discussion with plaintiff emphasizing her opinion that

complying with his physical therapy and continuing a weight loss program would ease his symptoms.

(ECF No.8-2, p.633).  She recommended that plaintiff return for re-evaluation in three months, and

opined that he needed to work a little harder on his knee in terms of riding a stationary bicycle and doing

his exercises as it would quiet down his symptoms; to continue on his weight loss program; and, on their

next visit, to evaluate whether a local steroid injection would be helpful.  *Id.*

On December 20, 2010, Dr. Make re-evaluated plaintiff, noted he had COPD at GOLD[3] 3-4 and needed a neural consult and psychiatric follow up for depression.  (ECF No.8-2, pp. 668-669).  On January 10, 2011, Dr. Make in a Medical Questionnaire opined that plaintiff had a poor prognosis due to his advanced COPD and would not be capable of sustained employment on a regular basis.  (ECF No.8-2, pp.666-679).  On March3, 2011, Dr. Make reiterated that earlier stated opinion (based on his December evaluation of plaintiff), in an updated Colorado Dept. of Human Services Med-9 form.  (ECF No.8-2, p.666).

On September 16, 2011, plaintiff presented complaining of increasing bilateral knee symptoms.  (ECF No. 8-2, pp 697-698).  Dr. Regan saw and examined plaintiff, noting that he had a negative McMurray's test[4] on both knees and a positive Tinel test over his wrist median nerves.  *Id.*  She treated his knee pain with bilateral steroid injections which gave him good short-term pain relief.  *Id.*  On April 3, 2012, Dr. Make signed a parking privileges application for persons with disabilities, checking the qualifying criteria boxes of: (1) persons who could not walk without an assistive device; and (2) persons who use portable oxygen.  (ECF No. 8-2, pp.700-701).  On April 10, 2012, Dr. Make completed a Med-9 Form, opining that plaintiff was disabled due to COPD, degenerative joint disease; profound dyspnea; impairment of mobility; and anxiety and depression.  (ECF No. 8-2, pp.703-704).

### C.    Hearings Testimony:

On February 18, 2011, (the day after plaintiff's first administrative hearing), the ALJ sent an interrogatory to Richard Gardner, M.D., enclosing a disk containing plaintiff's medical record.  (ECF No. 8-2, p.680).  The ALJ asked Dr. Gardner whether plaintiff's respiratory medical impairment, as established in the medical evidence, met or equaled an 3.00 Listing (impairments from respiratory

---

[3] Global Initiative for Chronic Obstructive Lung Disease – a system for classifying people with COPD.  Stage 3 is severe and Stage 4 is very severe (the highest classification).
[4] McMurray test: A test for injury to meniscal structures of the knee in which the lower leg is rotated while the leg is extended; pain and a cracking in the knee indicates meniscal injury.  Dictionary.com.

disorders) and, if it did, to state his reasoning.  *Id.*  Dr. Gardner opined that based on his review of the record, plaintiff did not meet or equal a 3.00 Listing level of impairment.  *Id.*

The ALJ held a supplemental hearing on July 13, 2011, to evaluate Dr. Gardner's report. Plaintiff appeared and was represented by counsel at both the February 17, 2011 and July 13, 2011, administrative hearings.  (ECF No. 8-2, pp.35-46, 50-71.)

**D.    ALJ's Decision:**

The ALJ found that plaintiff had not engaged in substantial gainful activity since January 10, 2007, the alleged onset date of his disability, and had severe impairments of: COPD, right knee swelling and pain, and obesity.  (ECF No.2, p. 17).  The ALJ discussed other impairments which plaintiff alleged caused him disability, and relying on various medical records and opinions, found that none of them (his pain and swelling in bilateral hands and ankles; back pain; and mental impairments) were severe.  (ECF No.8-2, pp.17-19).  In so doing, the ALJ relied on *inter alia,* various reports indicating plaintiff's complaints were inconsistent with his activity level (e.g., plaintiff shoveling snow in April 2010), and that plaintiff was noncompliant with various provider's recommendations for mental health treatment. (ECF No.8-2, pp.18-19).  In assessing plaintiff's alleged mental impairment, the ALJ assigned substantial weight to the opinion of Dr. Grenhart, a consultative examiner, who reported generally unremarkable findings.  (ECF No.8-2, pp.18-19, (citing Ex.10-F, pp.556-57)).

In Step Two, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (ECF No. 8-2, p.19).  The ALJ found both Dr. Gardner's opinion that no listing under Section 3.00 (respiratory system) was met or equaled, and Dr. Canham's test findings that plaintiff's results were not severe, were consistent with and supported by the record.  (ECF No. 8-2, pp.19-20).

The ALJ after a thorough discussion of the medical record, determined that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the record and that plaintiff had the residual functional capacity (RFC) to perform sedentary work where he would not be required to: stoop, crouch or climb stairs and ramps more than occasionally; climb ladders/ropes/scaffolds; crawl and kneel; handle or finger objects (with the non-dominant upper extremity) more than frequently; work at unguarded heights or near unguarded hazardous mechanical equipment; be exposed to excessive dust, fumes, or gases more than incidentally on a rare basis; or work near open flames.  (ECF No. 8-2, pp.20-26).  The ALJ found that plaintiff's obesity had some impact on his functioning noting that the medical source opinions included the effects of his obesity in the limitations provided.  (ECF No.8-2, p.26).

The ALJ also offered detailed explanations for the weight he did or did not assign to various health care providers and consultants opinions.  (ECF No. 8-2, pp.20-26).  Additionally, the ALJ noted that in considering plaintiff's third-party evidence (Ms. Gunderson's July 2011 letter), he found her evidence did not affect the outcome of this matter because: (1) her statement/evidence was colored by her friendship, inconsistent with or contradicted by prior statements or other evidence in the record, and not given under oath; and (2) she was unqualified to offer expert opinion as to plaintiff's impairments or ability to work.  (ECF No. 8-2, p.25).

Based on his findings and the vocational expert's (VE) testimony, the ALJ determined plaintiff could not perform his past relevant work as a tow truck driver or floor installer.  (ECF No. 8-2, p.26).  However, the ALJ found that considering plaintiff's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines (the grids), he had the ability to perform all or substantially all of the requirements of unskilled sedentary work (impeded by additional limitations) and thus would be able to perform the requirements of a sedentary occupation for example, a telephone

quotation clerk.  (ECF No. 8-2, pp.26-27).  The ALJ therefore found that plaintiff had not been under a

disability, as defined by the Social Security Act, from January 10, 2007, through the date of his decision.

(ECF No. 8-2, p.27).

>      E.      **Appeal's Council Decision:**

The Appeals Council adopted the ALJ's findings and conclusions.  (ECF No.8-2, pp.4-7).  The

Appeals Council noted that the ALJ did not evaluate plaintiff's medically determinable condition of

depression (*i.e.,* mental impairment) in accordance with regulations.  (ECF No. 8-2, p.5).  The Appeals

Council then adopted Dr. Wharry's opinion which supported the ALJ's finding that plaintiff's

depression was non-severe.  *Id.*  The Appeals Council also addressed Dr. Finch's October 27, 2010,

report which, if accepted, would indicate plaintiff was unable to perform the work cited at Step Five.  *Id.*

The Appeals Council detailed why Dr. Finch's opinion was not entitled to significant weight and

adopted the VE testimony that even if plaintiff were limited to occasionally handling and fingering

bilaterally, there were still jobs in the national economy he could perform.  (ECF No. 8-2, pp.5-6).  After

considering the entire record, the Appeals Council found that plaintiff had the capacity to perform

sedentary jobs available in significant number in the national economy and thus was not disabled as

defined in the Social Security Act at any time through the date of the ALJ's decision on July 25, 2011.

(ECF No.8-2, p.6).

>      III.      **DISCUSSION**

>      A.      **Standard of Review:**

An individual seeking disability benefits bears the burden of proving a disability.  42 U.S.C. §

423(d)(5).  The Act defines "disabled" as an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §423(d)(1)(A).  To meet this burden, a plaintiff must provide medical evidence of both, an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and of the severity of that impairment during the time of his/her alleged disability.  42 U.S.C. § 423(d)(3); 20 C.F.R. §§404.1512(b) and 416.912(b).  A plaintiff is disabled only if his impairments are of such severity that s/he is not only unable to do his/her previous work but cannot, considering his/her age, education, and work experience, engage in any other kind of substantial gainful work in the national economy.  42 U.S.C. §423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. §§404.1520 and 416.920; *Williams v. Bowen,* 844 F.2d 748, 750-51 (10th Cir. 1988). In reviewing a decision of the Commissioner, the court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence.  *Grogan v. Barnhart,* 399 F.3d 1257, 1261-62 (10th Cir. 2005).  The court may neither re-weigh the evidence nor substitute its judgment where it might have reached a different conclusion.  *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994).

**B.    Issues:**

1.    Whether the ALJ applied correct legal standards :

Plaintiff argues the ALJ failed to apply the correct legal standard with respect to his various subjective complaints.  (ECF No. 27).  Plaintiff asserts that the ALJ applied an incorrect legal standard to his subjective complaints of shortness of breath and his resulting fatigue and to his pain which results in loss of function of his right knee.  (ECF No. 27, pp.7-10).  Plaintiff contends that the ALJ should have applied the "loose nexus" test articulated in *Luna v. Bowen,* 834 F.2d 161, 163-64 (10th Cir. 1987). Plaintiff asserts there was a "loose nexus" between his various complaints of: (1) shortness of

breath/need for oxygen and intense fatigue upon exertion; (2) pain and problems of stability from an injured right knee; (3) bilateral thumb and finger numbness with repetitive use; (4) pain in his lumbar spine after lifting or carrying; and (5) depression and feelings of isolation.  (ECF No. 27, pp.13-14).

Defendant counters that plaintiff's assignment of error essentially attacks the ALJ's finding that plaintiff's subjective complaints of pain and other symptoms were not entirely credible and are based on a misunderstanding of the "loose nexus" standard articulated in *Luna*.  (ECF No.16, pp.13-14).  Here, the defendant argues, consistent with *Luna,* the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, i.e., there was a "loose nexus," between plaintiff's various alleged symptoms and his medically determined impairments but, nevertheless determined that plaintiff's statements were not entirely credible.  (ECF No.16, p.14,n.16).

While cast as a dispute with respect to the "loose nexus" test, plaintiff really is attacking the ALJ's discounting of plaintiff's subjective complaints.  Both here, and in a later claim of improper assessment of credibility (ECF No.27, p.11), plaintiff challenges the ALJ's credibility determination.

Credibility determinations are the particular province of the finder of fact.  *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  They will not be overturned when supported by substantial evidence.  *Id.*  However, credibility findings should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1998).  When subjective pain testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.  *Hackett v, Barnhart,* 395, F.3d 1168, 1173 (10th Cir. 2005)( quotation omitted).

My review of the record indicates that the ALJ reasonably discounted plaintiff's testimony regarding his subjective complaints after setting forth the specific evidence including but not limited to: plaintiff's daily activities; inconsistent statements to various providers; plaintiff's stated inability to pay

for surgery when he was in fact insured; inconsistent statements about his level of use of oxygen; his

failure to follow medical advice, and the discrepancies between plaintiff's complaints, the treatment

sought and the objective medical findings.  (ECF No. 8-2, pp 22-26).  I therefore find there is substantial

evidence in the record for the ALJ's determination that plaintiff's subjective complaints were "generally

not reliable."  (ECF No. 8-2, p.23).

　　　　2.　　　Consideration of plaintiff's impairments in combination:

　　　　Plaintiff's next assignment of error argues that the ALJ failed to consider the combined effect of

all of plaintiff's impairments.  (ECF No. 27, pp.10-11).  Plaintiff argues that if the ALJ had applied the

correct legal standard, he would have come to a different conclusion.  *Id.*

　　　　Defendant responds that the ALJ's statement that he "considered all medically determinable

impairments, both severe and nonsevere" in developing plaintiff's RFC is sufficient to establish that he

and the Commissioner properly considered all impairments.  (ECF No. 16).  Additionally, the ALJ

specifically discussed plaintiff's impairments in various parts of his decision, demonstrating that he

considered plaintiff's impairments in combination.  *Id.*  Finally, defendant argues that the ALJ

reasonably articulated the portions of the record that he considered including evidence of: bone density

loss; anxiety; opinions of Drs. Make, Finch, and Grenhart; NP Van DeWalker's opinion; and Ms.

Gunderson's letter expressing her opinion.  (ECF No.16).

　　　　Although not set forth with specificity, plaintiff's contentions regarding his combination of

impairments appear directed at the RFC and Step Five determination of non-disabled.  An ALJ must

evaluate a claimant's physical and mental RFC and must include all of the claimant's medically

determinable impairments.  20 C.F.R. § 404.1520(a); 20 C.F.R. § 404.1545(a)(1) and (2).  Here, at an

earlier step, the ALJ stated that "[t]he claimant does not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments…."  (ECF No.8-2, p.19).  This

Circuit has stated "our general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter." *Hackett v. Barnhart,* 395 F.3d 1168, 1173 (10th Cir. 2005). Furthermore, in considering plaintiff's RFC, the ALJ considered the record as a whole and discussed the evidence and all impairments in detail. The ALJ gave detailed reasons for his conclusions and demonstrated that he did sufficiently consider all of plaintiff's impairments and combination of impairments.

3.     Whether the ALJ failed to properly consider various evidence:

Plaintiff complains about the ALJ's rejection of certain opinions in the record, asserting that the ALJ committed error in rejecting these opinions. More specifically, plaintiff claims error with respect to assertions of disability contained in Dr. Make's Med-9 form, NP VanDaWalker's Med-9 form and statements of a friend and former employer (Ann Gunderson), all of whom stated that plaintiff was disabled. (ECF Nos.8-6, pp.282, 288-89; 8-9, pp.661-6, 683-83). Additionally in an undeveloped argument contained within a single sentence in plaintiff's opening brief's conclusion, he asserts that the "restrictions on his use of hands observed by Dr. Finch would bar all sedentary employment." (ECF No. 27, p.19). Reduced to its core, plaintiff's position is that since others opined that plaintiff is disabled, a contrary finding by the ALJ is error.

Defendant responds that the ALJ properly weighed and considered these various opinions. Additionally as it pertains to Dr. Finch, defendant argues that plaintiff's argument is not fully developed and is therefore waived. (ECF No. 16, p.25).

My review of the record reveals no error. The ALJ correctly noted the conclusory claims of disability asserted by others were opinions on matters reserved to the Commissioner. In terms of Med-9 forms, these are entitled to no specific weight as they are conclusory forms for state disability without meaningful functional findings. *Chapo v. Astrue,* 682 F.3d 1285, 1289 (10th Cir. 2012). The ALJ in

discussing the "disability opinions" of Dr. Make and NP VanDaWalker, set forth multiple reasons for affording little weight to these opinions.  (ECF No.8-2, p.25).  Moreover, although he discounted their opinions of disability, the ALJ carefully reviewed the medical conditions which led Dr. Make and NP VanDaWalker to their conclusions.  (See e.g., ECF No. 8-2, pp.18-19 (anxiety) and pp.18-26 (COPD and joint issues)).

As for Dr. Finch's opinion regarding plaintiff's use of his hands, there are three responses.  First, as noted by defendant, this argument was not developed in plaintiff's opening brief and is thus waived. *Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1161 (10th Cir. 2012).

Second, although the ALJ failed to discuss Dr. Finch's specific opinion relating to plaintiff's use of his hands (ECF No.8-9, pp.684-95), the Appeals Council did note this fact.  (ECF No. 8-2, p.5).  The Appeals Council then discussed Dr. Finch's opinion, concluded that it was not entitled to significant weight and affirmed the ALJ's decision.  (ECF No. 8-2, pp.5-7).  Plaintiff fails to discuss or find error with the Appeal's Council's determination.

Third, the VE testified that there were still jobs in the national economy which plaintiff could perform, even if he was not required to handle or finger objects more than occasionally.  (ECF No. 8-2, p.70).

4.    Whether the ALJ failed to fully develop the record:

Plaintiff argues that the ALJ failed to develop the record on material issues.  (ECF No. 27, pp.16-18).  Specifically, plaintiff contends the ALJ failed to: adequately develop the medical record from Dr. Gardner, the consulting physician, regarding COPD and asthma and its effect on plaintiff's ability to function in the work place; failed to seek a consultative examination from a specialist in impairments of the upper extremities and hands, as the ALJ found that plaintiff could "frequently" use his hands and rejected plaintiff's testimony he was limited in the use of his hands even though two physicians

observed a positive Tinel's sign, and (3) failed to request a consultative examination for plaintiff's low

back and carpal tunnel syndrome problems, as the ALJ rejected plaintiff's testimony regarding these

problems and that he had not sought care for them due to financial reasons.

Defendant argues there is no duty to affirmatively develop the record if sufficient evidence exists

in the record to make a disability determination.  (ECF No. 16, pp.25-27, citing *Cowan v. Astrue*, 552

F.3d 1182, 1187 (10th Cir. 2008).).  Defendant argues that the Commissioner also has broad discretion in

deciding whether to order a consultative examination.  (ECF No. 16, pp25-26, citing *Diaz v. Sec'y of

Health and Human Servs.,* 898 F.2d 774, 778 (10th Cir. 1990).

I agree, the Commissioner has broad latitude with regard to ordering consultative examinations.

Further, I find that the ALJ had no duty to order a second consultative exam particularly where, as here,

there is substantial evidence supporting his decision and plaintiff did not contend that the evidence

regarding his COPD or carpal tunnel syndrome was conflicting, insufficient or inconclusive, and did not

indicate at the hearing that further development was required.

## IV.    CONCLUSION

For the reasons stated above, the Commissioner's May 24, 2012, final decision is AFFIRMED.


IT IS SO ORDERED

DATED this 26th day of August, 2015.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge